## WHITENECK & BASSETT v. WEAVER.

No. 18349.    Opinion Filed Oct. 15, 1929.

Sam L. Darrah, for plaintiff in error.

Meacham & Meacham and Melton & Melton, for defendant in error.

DIFFENDAFFER, C.    John G. Weaver, defendant in error, was plaintiff below, and plaintiff in error was defendant below. The parties will be referred to herein as in the trial court.

Plaintiff sues defendant for damages for breach of an alleged contract for the sale of 100 bales of cotton. The contract was alleged to be oral and entered into November 3, 1925, wherein defendant agreed to sell to plaintiff, and plaintiff agreed to buy from defendant, 50 bales of cotton then located in public gin yard at Butler, Okla., and 50 bales of cotton located in public gin yard at Leedy, Okla., to be delivered to plaintiff in the yard, defendant to take responsibility of making immediate shipment of the cotton to plaintiff in addition to delivery. The agreed price was alleged to be 13 cents per pound,

to be paid when defendant shipped the cotton. It was further alleged that in pursuance of said contract, plaintiff, on or about the 6th day of November, 1925, sent his agent to Butler and Leedy, Okla., and defendant there delivered said cotton to plaintiff, bale by bale, by setting same aside to plaintiff and by tagging in plaintiff's name, with tags bearing the name of plaintiff, and by delivering to plaintiff a coupon duplicate ticket to correspond to the tag attached to each bale, corresponding numbers being upon each tag and coupon, and by delivering to plaintiff a part or sample from each bale.

It was further alleged that within a day or two thereafter, defendant, without notice to plaintiff, upon a rise in the market value of the cotton, removed the tags therefrom and afterwards sold the cotton to other persons; that, at that time, the market value of the cotton was 15 cents per pound, whereby plaintiff was damaged in the sum of $1,000, for which sum he prayed judgment.

Defendant answering denied the contract, alleged that no part of the purchase price was paid; that no delivery of the cotton was made or authorized to be made; denied that it tagged the cotton or in any manner did any act toward delivery of the cotton to plaintiff; denied that defendant agreed to deliver said cotton on board cars for plaintiff; and alleged that plaintiff failed and refused to receive the cotton as per their alleged oral contract or negotiation, and that if any contract was made, plaintiff breached the same. Plaintiff replied by general denial.

The cause was tried to a jury, resulting in a verdict in favor of plaintiff for $1,000, upon which verdict, after unsuccessful motion for new trial, judgment was rendered, and defendant appeals.

Defendant relies principally upon the statute of frauds as a defense. It is conceded that the contract was oral. Defendant admits that it sold plaintiff 100 bales of cotton by telephone. The class or grade of cotton agreed upon was what is known to the trade as "gin run snaps." The price agreed upon was 13 cents per pound, as expressed by both parties, "hog round."

It is agreed that no part of the purchase price was paid, and that no memorandum of the agreement was made in writing signed by the defendant or its agent. The question then is, whether or not there is sufficient evidence to show that plaintiff accepted or received part of the cotton.

The evidence from the standpoint of plaintiff's case, in substance, shows that, on November 3, 1925, after the telephone conversation of November 3rd, plaintiff sent his agent, Paul L. Smith, to Butler and Leedy, to "take up the cotton." He first went to Butler where he found Messrs. Whiteneck and Quatterbaum; first talked to Mr. Whiteneck, and told him he had come after the cotton, to which he replied: "All right." They then went to the gin and met Quatterbaum, who had the records of the cotton, consisting of a book in which was listed the numbers, weight, etc., of the cotton, located in the yard. Smith had with him a book described as a "regular take up cotton book." The pages of the book were arranged in four columns. The column to the left was headed "Our Tag"; the next column was headed "Yard Number"; the next, "Class"; and the fourth, "Weight." When the three went to the yard where the cotton was located, defendants, when they came to a bale of cotton bearing their number, would point it out to Smith, and he would attach Weaver's tag to it. Quatterbaum would then write in Smith's "take up book," in the proper column under the heading "Our Tag," the number corresponding to the number of the tag, and the yard number and weight in the proper column. The class was not written. The form of the tag was shown to be:

There were not 50 bales at Butler belonging to defendant, the number being from 35 to 38. Whiteneck and Smith would sample the cotton, Whiteneck would cut the bale on one side and Smith on the other, each taking a sample of the cotton. If found to be within the class mentioned in the agreement the coupon would be detached from the tag and placed between the two samples taken from the bale, and the samples so taken, together with the coupon, would be turned over to Smith and kept by him. Whiteneck then told Quatterbaum to go with Smith to Leedy and get the cotton there and he (Whiteneck) would stay in Butler and buy in enough cotton to make up the 50 bales, or, as expressed by the witness, "buying the balance of it."

Smith and Quatterbaum then went to Leedy, where the cotton on the yard there was

tagged and sampled in a similar manner, except that some of the numbers, weight, etc., were entered in the "Take up book" by Smith and some by Quatterbaum. While the cotton at Leedy was being sampled, some six bales were objected to by Smith as not being "gin run snaps," but' were what he termed "dogs." What was meant by that term was not explained, except that Smith testified that these six bales were of considerable lower grade than "gin run snaps," and worth some $10 per bale less.

It was upon the rejection of these six bales that defendant based their charge that plaintiff breached their alleged contract, it being claimed by defendant that the agreement was that plaintiff was to take all the cotton defendant had, at the same price. We will notice this contention later.

Some 43 bales were cut and sampled at Leedy, six of them being rejected. Smith and Quatterbaum then returned to Butler, and Smith had some conversation with Whiteneck. He testified that he told Whiteneck that they lacked some seven or eight bales of getting the 50 bales at Leedy, besides the six bales which were rejected; that Whiteneck told him that he had bought in but six bales that day, but that he would stay there that night and try to buy in as many as he could; that they would not be able to buy in enough that night; that they would buy it in the next day, and for Smith to "Come back Saturday, and we will deliver the balance of the cotton." Smith returned to Clinton and did not talk with either of defendants until Friday night, when in a conversation with Whiteneck over the telephone, Whiteneck told him that because Smith had cut out the six bales at Leedy, they had decided not to deliver the balance of the cotton. The next day Smith went to Butler and talked with Whiteneck and tried to get the balance of the cotton. Whiteneck said, "No"; that was all he would say; that Smith then told him he wanted to ship out the cotton that had been sampled and tagged, and Whiteneck told him the tags had been taken off, but did not tell him who had taken them off.

The evidence further shows, in substance, that before the agreement was entered into, plaintiff had an order for some 300 bales of cotton of the class mentioned, and that the cotton in controversy was contracted for, for the purpose of filling this order; that upon the refusal of defendant to carry out the contract, plaintiff was compelled to buy 100 bales of cotton elsewhere; that, in the meantime, cotton of this class had advanced some 2 cents per pound; Therefore, the 100 bales cost him $1,000 more than his contract with defendant called for.

The evidence further shows that defendant kept the cotton at Butler and Leedy for sometime, when it was sold to other parties for 16 cents per pound.

Defendant in its brief says that it relies for a reversal of the judgment upon two propositions:

"(1) That the court committed error in not sustaining defendant's demurrer to plaintiff's evidence.

"(2) The verdict of the jury is not sustained by the evidence."

It is the well-settled rule that a demurrer to the evidence admits every fact which the evidence adduced by the opposite party in the slightest degree tends to prove, and all the inferences and conclusions which may be reasonably and logically drawn therefrom, and this court will consider as withdrawn all evidence which is most favorable to the party demurring. Forry v. Brophy, 116 Okla. 99, 243 Pac. 506; Gourley v. Jackson, 116 Okla. 30, 243 Pac. 243; Harley v. Paschall, 115 Okla. 294, 243 Pac. 167; Tidal Refining Co. v. Knox Oil Co., 116 Okla. 1, 243 Pac. 150; Eagle Loan & Inv. Co. v. Starks, 116 Okla. 149, 243 Pac. 723; Fahey v. Mitchell, 116 Okla. 296, 244 Pac. 761; Calhoma Oil Syndicate v. Atlas Supply Co., 117 Okla. 6, 244 Pac. 770.

Applying this rule, the demurrer of defendant to plaintiff's evidence was properly overruled, if from plaintiff's evidence considered in its most favorable light toward his case, the jury would have been justified in a finding that plaintiff had accepted and received a part of the cotton. This question is raised and presented under the second proposition, viz., "That the verdict is not sustained by the evidence." The two propositions present practically the same question, that is, Was there sufficient evidence of acceptance and receipt of a part of the cotton by plaintiff?

It is conceded that plaintiff and defendant entered into the contract for the sale of the cotton; that the contract was oral; that no part of the purchase price was paid; that there was no note or memorandum of the transaction signed by defendant or its agent.

The statute of frauds does not prohibit oral contracts. On the contrary, it presupposes that the terms of the contract rest in parol proof, and only requires, in addition to the proofs of the contract, evidence of acceptance and receipt of the goods or a part thereof, or part payment; it merely renders

it necessary for a party claiming under it to show an additional fact (in this case, an acceptance or receipt of the cotton or a part thereof) to make it valid.

The terms of the contract are, in the first instance, agreed upon, and would be binding except for the provision of the statute, which exception is removed by subsequent acceptance or receipt of the goods, or a part thereof, and thus establishing the contract as valid ab initio. Swafford v. Spratt (Mo.) 67 S. W. 701.

To constitute an acceptance or receipt required by the statute, there must be shown a transfer of the possession of the goods or a part thereof, by and from the seller to the buyer, either actually, by manual delivery, symbolically, by some substitute delivery, or, constructively, by change in the nature of the seller's subsequent holding.

A constructive delivery is when, without any actual transfer of the goods, or their symbol, the conduct of the parties is such as to be inconsistent with any other supposition than that there has been a change in the nature of the holding by the seller; and whether there has been such a change is a question for the jury. Swafford v. Spratt, supra.

Questions of the kind are undoubtedly for the jury; and it is well settled that any acts of the parties indicative of ownership by the vendee may be given in evidence to show the receipt and acceptance of the goods to take the case out of the statute of frauds. Conduct, acts and declarations of the purchaser may be given in evidence for that purpose. Garfield v. Paris, 96 U. S. 557.

Goods may remain in the possession of the seller, yet there may be a receipt by the buyer, if the seller ceases to hold as owner and agrees to hold as bailee of the buyer with his consent. 27 C. J. 247, and cases under note 75.

No case is cited by either party dealing with facts identical with the ones shown here, and we have found none. But in Hodgson v. LeBret, 1 Camp. 233, an early English case, facts very similar were shown. There defendant LeBret went to the shop of plaintiff Hodgson and purchased a piece of Irish linen and several pieces of muslin; she wrote her name upon the linen at the time; but the muslin was not produced. None of the goods were sent to her home until some months later, when she refused to accept same, saying she had not bought same. In an action for goods sold and delivered, defendant contended that the contract was void, under the statute of frauds, being for the sale of goods above the value of 10 shillings and the buyer not having accepted any part of the goods, nor given anything in earnest to bind the bargain, and there being no memorandum in writing. It was there held that the writing of her name upon the linen, if done with intent to denote that she had purchased same, and appropriate to her own use, was enough to take the sale as to the article written upon, out of the statute of frauds.

Another early English case cited in support of the above case is Anderson v. Scott (cited in 1 Camp. 233), where in special assumpsit for the nondelivery of wine bought by plaintiff from defendant, it appeared that plaintiff went into the defendant's wine cellar and selected several pipes (casks) of wine, for which he agreed to pay a certain price. The spills or pegs by which the wine was tasted were then cut off; plaintiff's initials were marked upon the cases by defendant's clerk in his presence and plaintiff took the guage numbers. The defense was that the sale was within the statute of frauds, but it was held that the cutting off the spills and marking of plaintiff's initials on the casks in the presence of all the parties amounted to a delivery, so as to support a recovery for damages for the noncompletion of the contract. These are old cases, but we do not find where the rules there laid down have ever been repudiated by any court.

In cases of this nature, the question of acceptance and delivery is to be determined largely by the intent of the parties, and this intent is a question of fact to be determined by the jury from the evidence. The conduct, acts and declarations of the parties may be given in evidence for this purpose. Garfield v. Paris, supra.

The question of fact as to whether or not there had been a delivery and acceptance of a part of the cotton was submitted to the jury by appropriate instructions, which were not excepted to. We think there was ample evidence to support a finding in favor of plaintiff on this question, and the verdict will, therefore, not be disturbed upon the ground that such verdict is not sustained by the evidence.

It is further contended that the plaintiff himself breached the contract and was therefore not entitled to recover. This is based upon the rejection of the six bales mentioned. The evidence as to the rejection of these bales as not being within the

class mentioned, viz., "gin run snaps," and that it was so agreed between the parties at the time the bales were sampled, is practically uncontradicted. Smith testified that when these six bales of cotton were sampled by himself and Quatterbaum, he called Quatterbaum's attention to the fact that they were not within the class, and said to him: "This cotton is lower than the cotton we were to take on this contract," and that Quatterbaum replied: "Well, now, I don't know how come us with this low cotton." That Quatterbaum then said: "All right, cut them out." That thereupon Quatterman himself ran a line through the numbers and description of these six bales which had been entered in the "Take up book."

Quatterbaum was not a witness, and this evidence was not in any way contradicted, except by the testimony of the witness A. A. Butler, offered by defendant, who testified, in substance, that he was present and heard some discussion between Smith and Quatterbaum and that Quatterbaum seemed to be objecting to cutting these bales out, and that Smith took the tags off of the bales, and that he did not see Quatterbaum run the lines through the description of the six bales on the "Take up book."

The best that can be said of the evidence on this point is that it was conflicting. The conflict, if such, in the evidence, having been submitted to the jury and decided in favor of plaintiff, by the verdict of the jury, the question is brought squarely within the rule that, where a controverted question of fact is submitted to and decided by a jury upon conflicting evidence, such finding will not be disturbed upon appeal as not being sustained by the evidence.

There being ample evidence to support the verdict, and no question being raised as to the instructions, the judgment should be affirmed.

BENNETT, HERR, HALL, and JEFFREY, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) anno. 4 A. L. R. 920, 921; 25 R. C. L. p. 628; 3 R. C. L. Supp. p. 1425. (3) 25 R. C. L. p. 632. See "Frauds, Statute of," 27 C.J. § 273, p. 242, n. 8; § 286, p. 247, n. 75; § 289, p. 251, n. 11; § 487, p. 389, n. 88; §493, p. 391, n. 10.