Elmo F. ABEL and Bette Joan Abel, husband and wife, Plaintiffs in Error,

v.

Franz E. BACHMANN, d/b/a Arrow Water System Company, Defendant in Error.

No. 40642.

Supreme Court of Oklahoma.

March 2, 1965.

Brown & Garrison, Tulsa, for plaintiffs in error.

Paul E. Simmons, Broken Arrow, for defendant in error.

BLACKBIRD, Justice.

This appeal is the result of defendant in error's effort to enforce his claimed contract with plaintiffs in error to purchase from him an electric pump for a water well on their small tract of land, or acreage, near Broken Arrow, Oklahoma. Upon the theory that he had furnished plaintiffs in error "materials" for said well, pursuant to such contract, defendant in error, hereinafter referred to as defendant, filed a "Material or Mechanic's Lien" on said property.

Thereafter, plaintiffs in error, hereinafter referred to by name, or as plaintiffs, instituted the present action to clear their title of defendant's said claimed lien and for damages for his filing of same, as a slander of their title, and for their attorney's fees and costs. Defendant answered with a qualified general denial, coupled with a cross petition, in which, among other things, he referred to the lien he had filed as "Exhibit 'A' ", made it a part of his pleading, alleged that the "material referred to therein was furnished plaintiffs pursuant to an oral contract he had entered into with the plaintiff, Elmo F. Abel", and, among other things, sought judgment against plaintiffs for the amount of his lien claim in the sum of $546.-00 and foreclosure of said claimed lien on plaintiffs' afore-mentioned acreage. In their reply, plaintiffs denied, among other things, that they had entered into an oral contract with defendant, as he alleged.

After a trial to the court, a general judgment was rendered for defendant in the sum of $546.00, with interest and attorney's fees, decreeing him to have a valid materialman's lien on plaintiffs' land, and to be entitled to its foreclosure.

After the overruling of their motion for a new trial, plaintiffs perfected the present appeal.

For reversal, plaintiffs urge two propositions. Under their first, they say that the evidence fails to show that they entered into an oral contract to buy the pump from defendant. Both sides recognize that, assuming the existence of such a contract, the evidence must show a compliance with the Statute of Frauds, Tit. 15 O.S.1961, § 136, which, in material part, reads as follows:

"The following contracts are invalid, unless the same, or some note or memorandum thereof, be in writing and subscribed by the party to be charged, or by his agent:

* * * * * *

"4. An agreement for the sale of goods, chattels * * * at a price not less than fifty dollars, unless the buyer accept or receive part of such goods and chattels * * *; * * *."

Since plaintiffs admit that if the evidence shows they accepted the pump within the meaning of such term in the quoted statute " * * * the contract becomes valid, and the Statute of Frauds is no defense", we will address ourselves directly to the task of determining whether, as to this feature of the case, the trial court's judgment is contrary to the evidence.

Some of the noteworthy matters revealed by our examination of the record are as hereafter set forth. In July, 1962, plaintiffs were planning to build a house on the aforementioned acreage they were in the process of purchasing. As a preliminary to their anticipated acquisition thereof and the future construction of a house thereon, they contracted with one Raymond Cotner to drill a well there. Before Cotner started the drilling, he told Mr. Abel, who has a barber shop, and resides, in Broken Arrow, that there were two ways the financing of the project could be handled, namely: That Cotner could finance the well himself, or "the pump company" (presumably defendant) could "finance the whole thing * *" (which meant both the drilling, and the equipping, of the well). Cotner testified, without contradiction, that, when he started the drilling, Abel didn't know which method of financing he was going to use, but that, on July 14, (1962), when the witness had finished drilling it, Abel was at the well and " * * * told me to get ahold of the pump people, turn in my bill to them and let them get his credit approved, that he wanted a pump and pay for the well, and finance the whole thing." Cotner followed Abel's directions by contacting the defendant's employee, Darwin Maxy, who then told defendant that Abel "wanted to see us." Defendant and Maxy then made an appointment with Abel for July 16th, and, on that date, Abel went to defendant's shop, where, according to the defendant, he and Maxy recommended to Abel that a submergible pump, which defendant's shop did not stock, but could order, be installed in the well, and showed him the

specifications, price, etc., of that "particular pump." Defendant testified that Abel was particularly interested in financing the well and pump together, and that he then and there "filled out a credit application, signed it, and ordered the pump provided * * *— we could get it financed." In this connection, defendant introduced as his "Exhibit 2", a printed form addressed to, and apparently issued by, "FARMERS & MERCHANTS STATE BANK, TULSA, OKLA.", dated July 16, 1962, entitled: "CREDIT APPLICATION FOR HOME IMPROVEMENT LOAN." On that part of the form furnishing information as to the "PROPERTY TO BE IMPROVED", the defendant's afore-mentioned acreage was referred to, and identified, by its rural mailing address. In one of the blanks following that part of the form, it was represented that the proceeds of the loan would be used for "well-drilling and pump", at an "Estimated cost" of "$1130.00." Abel admitted he signed the application. Defendant submitted it to the above-named Tulsa bank and was informed that it did not make that type of loan. On July 18, 1962, Mr. Maxy talked to Mr. Ivan Brown, President of Broken Arrow's Arkansas Valley Bank, about the project and apparently received encouragement that his bank would make such a loan. He thereupon transmitted this information to Mr. Abel, and two days later, or on July 20th, returned to said bank, accompanied by Abel.

Interpreting the testimony most favorably for plaintiffs, it may be inferred that, on that occasion, Mr. Brown told Abel and Maxy he would approve the making of such a loan by his bank, if it was secured by a real estate mortgage. Upon Maxy's return to defendant's establishment, the subject pump was ordered, and Abel was so informed. Later, on August 4, 1962, Abel obtained a loan of $2200.00 at the Arkansas Valley Bank, by mortgaging a small tract adjoining the one involved here. $1700.00 of this amount was to liquidate an indebtedness to a Tulsa bank, on a station wagon plaintiffs were trading for the two tracts;

and the remaining $500.00 was to pay Cotner for his drilling of the well.

The evidence does not disclose what date the defendant's shop received the submergible pump he had ordered for plaintiffs' acreage, but, according to testimony elicited on behalf of the defendant (at sometime) between the date it was ordered, and the latter part of August, 1962, Mr. Abel agreed to meet defendant and Maxy out at the acreage about 8:00 or 8:30 o'clock on Monday morning, August 20th (1962) when they would deliver the pump and other equipment necessary to its installation there, and install it. At the appointed time, defendant and Maxy drove to the acreage in defendant's truck, hauling the pump, and perhaps a length of pipe and other auxiliary equipment. After they had waited there an hour or two, and Abel did not appear, they drove the loaded truck to plaintiffs' residence in Broken Arrow. There they talked to Abel, in Mrs. Abel's presence. As to what was said between the parties at this encounter, the testimony of the defendant and Maxy is in sharp conflict with that of the plaintiffs. According to the latter, Abel reiterated at that time what he testified he had previously told Maxy, i. e., in substance that he did not want, and was not going to buy, the pump; and also told them, in substance, that he was making other arrangements for one. In their testimony, defendant and Maxy denied that plaintiffs ever told them verbally that they did not want the pump, and testified, in substance, that Abel told them that, on account of having something else he had to do at that time, he could not then go out to the acreage, but that he agreed to meet them there about 2:00 or 2:30 o'clock that afternoon.

Thereafter, defendant and Maxy made no further effort to unload the pump at the acreage until about the designated time that afternoon, after they had gone to lunch.

The same afternoon, about 2:00 o'clock, in accord with an intention represented privately to his wife after defendant and Maxy had left plaintiffs' residence that morning, Abel went to defendant's shop,

found that neither he nor Maxy was there, and then went back to his barber shop, where he wrote them a note to the general effect that he did not want, and was not going to buy, the pump. Abel then took this note to defendant's shop, and left it there, in defendant's and Maxy's absence. He then drove to the acreage, and, from his testimony, it may be reasonably concluded that, en route, he saw, and passed, defendant's truck, without stopping, as said truck was returning to Broken Arrow from plaintiffs' acreage. Abel thereupon proceeded to the acreage, and, at the trial, testified that when he arrived there, there was no pump in the well and he saw no other thing or equipment there, such as defendant and Maxy testified they had unloaded there at a time (it may be inferred) only a few minutes previously. Maxy and defendant both testified, not only that they unloaded the truck, but that they also screwed a joint of pipe on the pump and placed it in the well with a cap that would hold it there. Two days later, or on Wednesday, August 22, 1962, defendant's lien was filed in the office of Tulsa County's Court Clerk.

■■ Plaintiffs recognize in their citation of Whiteneck & Bassett v. Weaver, 139 Okl. 88, 281 P. 293, that an agreement for the sale of chattels may comply with sec. 136, supra, if "constructively" (as distinguished from "actually") accepted by the purchaser, but they apparently take the position that such an acceptance by them of the subject pump must have been shown to have occurred at the acreage—where it was delivered—in order to have been effective. We do not agree. We think that when plaintiffs, through Mr. Abel, agreed to defendant subsequently delivering the pump—and there is ample evidence tending to show such agreement on at least two occasions—he constructively, or virtually, accepted it (in the absence, of course, of any contention and showing that the pump was defective, or was not the one he had selected to purchase on condition that his purchase could be financed. See 37 C.J.S. Frauds, Statute of § 148, p. 635 at Note 29). If, as

Abel testified, he had not orally assented in advance to such delivery then it is passing strange that he found it necessary to attempt to rescind such agreement by the written note he left at defendant's place of business at a time he knew that defendant and Maxy were not there. Nor could we criticize the trial judge if he considered unsatisfactory Mr. Abel's attempted explanation as to why, after leaving the note, he drove directly to the acreage. According to the evidence introduced on behalf of the defendant, he received no word from plaintiffs inconsistent with a continued desire on their part to purchase the pump, until he found the aforementioned note at his shop, *after* returning from unloading the pump on plaintiff's land. The note was then too late to accomplish its purpose. As held in Adams v. King, 68 Okl. 190, 170 P. 912:

> "The delivery and acceptance at any subsequent time of any part of the goods or chattels which are the subject of a parol contract, within the statute of frauds, *while such contract remains unabrogated*, take the contract out of the statute of frauds, and make valid the entire contract." (Emphasis added).

See also 37 C.J.S. Frauds, Statute of, § 147, p. 633, Notes 6 and 7. In our opinion the evidence in this case was such as to create an issue for determination in the trial court as to whether plaintiffs constructively and prospectively accepted delivery of the pump. That court's affirmative answer to this question cannot be regarded as clearly against the weight, or preponderance, of the evidence. The case of Grant v. Milam, 20 Okl. 672, 95 P. 424, cited by plaintiffs, is in accord, rather than contrary, to our holding herein. There the trial court submitted to a jury the question as to whether, under the circumstances, the defendants had accepted plaintiffs' delivery of corn. The verdict and judgment were for plaintiff, and this court affirmed.

■ Under plaintiffs' Proposition II, they call our attention to the undisputed fact that when defendant and Maxy de-

livered the pump and the auxiliary equipment to plaintiffs' acreage, the pump was not "installed" in such a way as to become an operating part of the well; and it seems to be an accepted fact that the pump cannot be used for the purposes for which it was furnished, until it is so installed. Among the cases they cite in support of their contention that, under this state of facts, defendant was not entitled to the lien the trial court awarded him on their acreage, are DeBolt v. Farmers Exchange Bank, 51 Okl. 12, 151 P. 686, and Walton Lbr. Co. v. Cox, 29 Okl. 237, 116 P. 798. While, in Brown v. Magers, Okl., 359 P.2d 321, 328, we pointed out a difference in the facts of that case and those in the DeBolt case that might also be said to distinguish the latter from the present case, we think the court in the case of In re Rhine (U.S. D.C.Colo.) 213 F.Supp. 527, 536–538, furnishes the answer to the issue here. There, after a discussion in which the above and other cases were cited, the court announced this succinct conclusion:

> "It would appear then from a cursory examination of the authorities that the requirement of use is real and not theoretical, and that there must be proof by the claimant that the property was not only delivered *but was in fact incorporated.*" (Emphasis added).

In our opinion, the quoted announcement reflects the proper answer to the question here presented under the Oklahoma mechanics and materialmen's lien statute, Tit. 42 O.S.1961, § 141. Since, in the present case, the evidence unquestionably rebuts any presumption that might otherwise have existed that the subject pump was incorporated, or used, in any structure or improvement on plaintiffs' acreage, the trial court erred in adjudging defendant to have a materialmen's lien on said real estate and to be entitled to foreclosure thereof.

On account of said error, which was the subject on the third ground of plaintiffs' motion for a new trial, the trial court should have sustained said motion as to those phases of the case. The court's order and judgment overruling said motion is therefore reversed, with directions to said court to effect nullification of defendant's materialmen's lien claim, and all relief previously granted him in connection with a foreclosure of such a lien. Said court is further directed to grant plaintiffs a new trial as to all other relief prayed for, and any other cause, or causes of action found to be stated in their petition, but not directly ruled upon in any previous order and/or judgment of said court.

HALLEY, C. J., JACKSON, V. C. J., and DAVISON, JOHNSON, WILLIAMS, IRWIN and BERRY, JJ., concur.